**NIEMIEC v. SEATTLE RAINIER BASE-
BALL CLUB, Inc.**

No. 1548.

District Court, W. D. Washington, N. D.
June 21, 24, 1946.

J. Charles Dennis, U. S. Atty., Tom A. Durham, Asst. U. S. Atty., and Patrick H. Winston, State Director of Selective Service, Associate Counsel, all of Seattle, Wash., for petitioner.

Chadwick, Chadwick & Mills and Stephen F. Chadwick, all of Seattle, Wash., for respondent.

BLACK, District Judge (oral).

In the matter of the petition of Alfred J. Niemiec against the Seattle Rainier Baseball Club, Inc., as respondent, I asked counsel to come in this morning so that I might advise them of my conclusion with respect to the result. I have read the cases bearing upon this matter. I have studied the exhibits and have considered the evidence, being refreshed by rather copious notes which I took Saturday.

I am satisfied as to what the decision should be in the light of the law as it was written and as interpreted by judicial decision binding upon me.

Many times I envy the baseball umpire who merely has to say "strike one" or "ball two" or "you are out," and also envy the jury which has the privilege of saying so much or so little, guilty or not guilty; but it is expected that I not only give my result but also the reasons.

This morning I am going to take some of the prerogative of the baseball umpire. I am going to announce the result, and will defer until next Monday afternoon at 4:30 p. m. the statement of at least some of the reasons which convince me that the result I announce is the correct one.

Under the evidence in this case, in the light of the law as I understand it, Mr. Niemiec's unconditional release by the baseball club on or about April 21st of this year was not a discharge for cause as recognized by the statute; therefore, the result is that he is entitled to compensation since his discharge, less credit for what he has received in other employment, and he is further entitled to have the contract reinstated. The respondent, of course, need not play him, but it must pay the petitioner. Recognizing that the respondent felt that its action was one that it had a legal right to take, I will next Monday afternoon at 4:30 give an analysis of the situation and the law as I see it. Thank you, Gentlemen.

It is now 4:30 o'clock of this 24th day of June, 1946. At this time I obligated myself to give some of the reasons as they appeared to me for the decision I announced last Friday morning after a trial the preceding Saturday.

In this case the petitioner, Alfred J. Niemiec, seeks decree to the effect that he is entitled to be reinstated to his former position of baseball player with respondent corporation at a salary of $720 per month as of the 21st day of April, 1946, and that the respondent be required to reinstate the petitioner and to pay the petitioner damages in the sum of $720 per month from April 21, 1946, to the date of the decree of this Court and for such other and further relief as may be proper in the premises.

The petition in brief alleges that it is brought under the provisions of Section 8 of the Selective Training and Service Act of 1940, as amended, same being subsections (b) and (c) of Section 308 of Title 50 U.S.C.A.Appendix. .He alleges further that he was employed by respondent corporation in February, 1940, as a baseball player and that he held such position until he entered the services of the armed forces of the United States.

He further alleges that about January 5, 1946, he completed his service in the United States Navy and received a certificate of satisfactory completion of training and service upon his separation from such. He further alleges that by February 11, 1946, he had signed a contract with respondent corporation to play baseball for such corporation at the rate of $720 per month for the baseball season 1946, but that the respondent terminated his employment on April 21, 1946, and has refused to reinstate him.

Respondent's answer in brief admits the earlier employment and that he continued to be employed until October, 1942. It further acknowledges that the petitioner entered the armed forces. The answer further admits that on January 20 of this year petitioner applied for reemployment and on February 11, 1946, signed a contract at the rate claimed. It further states that on April 21, 1946, petitioner was given an "outright and unconditional release" terminating his service under his contract with respondent.

By way of affirmative defense the respondent alleges that it is a quasi public institution not operated primarily for profit but to maintain baseball as a competitive sport and encourage youth to competitive athletic endeavor and to afford public entertainment. In addition to alleging the composition of organized baseball respondent alleges that baseball is a young man's game and that advancing years slow up players in their proficiency and render them progressively incapable of continued play in leagues of higher classification. It is alleged particularly that the petitioner was born May 18, 1911, and that during the seasons of 1940, 1941 and 1942 he was gradually slowing in his agility, professional ability and stamina. The answer further affirmatively alleges that during the playing seasons of 1943 to 1945 inclusive the petitioner was listed on respondent's roster as in the national defense service; that pursuant to his contract petitioner reported at training camp in 1946 on March 29 and remained until given his unconditional release April 21, and that during such time the petitioner demonstrated his inability to comply with and meet the accepted standards of work performance, professional skill and proficiency and stamina as required. The answer further alleges that the club carries a very substantial number of service men.

The reply in substance denies most of the answer alleged affirmatively, particularly with reference to petitioner's inability.

It may be said that the petitioner's contention is that under the letter and spirit of the Selective Service Act, 50 U.S.C.A. Appendix, § 301 et seq., he was entitled to be reinstated to his position and hold it for one year. The respondent's contention on the contrary is that baseball is in essence competition between clubs and between players and that the courts have no authority to substitute their judgment for the judgment of the employer as to the ability of the baseball player or the desirability of his retention.

In such connection the argument of respondent is pithily condensed in the statement that to allow the Court to decide the issue "must of necessity substitute the judicial robe for the manager's uniform and the Judge's bench for the coach's box."

I recognize the force of such position. It cannot be idly disregarded. Baseball is an American institution. Professional baseball is a great American institution. Compared with many professional sports and entertainments it holds a very high regard of the people of the nation. I cannot escape the view, however, that the argument of the respondent analyzed completely means just this, that if the baseball player be older when he comes back from service than when he entered it, his baseball club employer is given the right in its discretion to repeal the Act of Congress. If the fact that the petitioner grew older from the time he left until he came back is a defense, then, of course, he had no right to be reinstated at all. That argument of age consistently applied would give the employers of most other men returning from service the option to disregard the statute, because in many activities of employment those who pay for what is done contend that time takes its toll.

A very serious objection on the part of respondent is that the petitioner entered into a contract and that such contract specifically provided, "This contract may be terminated at any time by the Club or by any assignee by giving official release notice to the player." The argument based on that is that Mr. Niemiec had the right to waive the benefits of the Selective Service statute and that when he signed this contract he did waive them.

▆ The purpose of the guaranty of a year's employment to the returning service

man was compound. One purpose was to return him to his position so that he might be rehabilitated by the chance to do the things which he had left when he entered his country's defense activities. Another purpose was that while in service he should be able to render the best he had for his country unworried by the specter of no payment during the first year after he returned to civilian life.

I recognize that my oral decision last Friday morning seems to be inconsistent with the first purpose because I stated that as I see it the respondent need not play Mr. Niemiec but had to pay him. In this particular instance that inconsistency is not actual because counsel for the petitioner in effect agreed to release the respondent from the obligation to have him in the active line-up providing he should receive the salary. At least, I am satisfied that counsel for the petitioner will agree that in spirit such was their presentation.

But baseball is not a business in the sense that the manufacture of assembly goods is one. Mr. Niemiec before he went into service had no right to insist that he should play in any particular game or in any particular series. The employer before October, 1942, had the right to leave him on the bench or play him as it pleased. Nevertheless, it had to give him his compensation as long as he was on the roster. For me to say that Mr. Niemiec had to take his place in the line-up during each game or during a certain percentage of the games would be an attempt on my part to substitute the judicial robe for the uniform of a playing manager.

At this point I may say, however, that the employer had the obligation to give the baseball player returning from service who desires it the training and practice which the position calls for, and further, it would seem to me that no employer would even then be justified in terminating a player for inability unless it allowed him to participate actually in a reasonable number of games.

It is, of course, contended that the respondent did give the training and did use petitioner in the games during a reasonable portion of the playing season until his un-

conditional release. It was agreed by both sides in effect that whether or not there be cause for the discharge of a veteran is a question of fact. Therefore, I was confronted with the necessity of deciding it from the evidence presented to me.

The evidence fetched into court was very sketchy. From the evidence this much is practically undisputed, that up until the time Mr. Niemiec left the Rainier Baseball Club for military service that he was a very faithful and courageous player rendering good service. I recognize that there was some contention that he was over twenty-four years of age and therefore had passed the peak of athletic ability, but the undisputed evidence presented to me was that he was chosen as the outstanding second baseman of the Pacific Coast League in 1941. Now, either all the other second basemen in the League were over the thirty year age, which was his, or that age criterion is of no great assistance. As far as the evidence is concerned, Mr. Niemiec played in five games in April, 1946, for the respondent. Three of those games were won by Seattle. In those five games he made but one error. There is no evidence at all that his batting during that period for Seattle was not at least the equivalent of the batting percentage of any other players contending for that position who played during any of the games in the season up to April 21. As a matter of fact, there was no evidence that any successor of his made less errors or more hits. The only evidence as to the second baseman proficiency of the petitioner in the matter of double plays is his. There was not a syllable that any rival of his during that time or since has done any better. As far as the evidence before me is concerned, I have no idea whether Seattle during that period and up to now or up to the time of trial was in first place, second or last.

The Court can imply from the discharge of Mr. Skiff, as disclosed by the evidence, that it is very unlikely that the Seattle Baseball Team had any position in the League standing that was envied by many other of its competitors. But the evidence is silent. Mr. Niemiec testifies that the only reason given him for his discharge was that there were many baseball players

available and that the team would like to make room for younger players; and in substance Mr. Skiff and Mr. Torrance conceded as much. There was some further contention by them though. They wrote a letter, Exhibit 3, on April 20, 1946, one day before the discharge, "To Whom It May Concern: This will introduce player Al Niemiec. Al played on the Seattle Ball Club during three championship years, 1939, 1940 and 1941. We won the pennant all three years. He was chosen the outstanding second baseman of the League in 1941, and is one of the most dependable ball players we have ever had the privilege of having in the organization. Al has just returned from more than three years in the United States Navy and returned to our roster this year. The surplus of talent and the fact that we have had to make room for some younger ball players has made it necessary for us to dispose of Mr. Niemiec's services. Al still has a lot of fine baseball left, we are sure, * * *" Signed "Bill Skiff, Manager—R. C. Torrance, Vice-President."

These were the witnesses for the respondent. Mr. Taylor, coach for the respondent, testified that no one consulted him as to whether Mr. Niemiec was or was not rendering good service. In brief, his testimony was that had he been asked, he would have said that Mr. Niemiec was getting older and that a baseball player's peak is at about twenty-four years or at least thirty-one.

Mr. Taylor, according to his testimony, has a contract like Mr. Niemiec's, which is subject to cancellation immediately and without notice. The force of his testimony is much weakened by the fact that he was playing when he was thirty-six years of age. Mr. Skiff's testimony was much weakened by the fact that he was playing when about thirty-nine years of age. The undisputed evidence was that Jo-Jo White played good baseball for Seattle when he was thirty-six years of age. Mr. Niemiec was thirty-four years of age at the time of his unconditional release, very rapidly approaching thirty-five, which he achieved before the trial of this case. So as far as the evidence in this case is concerned,

it seems to me that there is no evidence except that Mr. Niemiec is older.

Many documents were presented in this case. I must consider those documents in connection with the contention that Mr. Niemiec had waived the Federal legislation in his behalf. Under the evidence Mr. Niemiec had to sign this contract as it was or play no more baseball; he had no choice. The Seattle Baseball Club had no choice except to tender him this contract. There is a very complicated organization constituting professional baseball. The respondent club itself has not much to say. Mr. Torrance had to sign an affidavit that there had been no modification of this uniform contract. He had to sign it under the risk of not only a fine but suspension from participation in National Association affairs for a period of two years. This contract does say it can be terminated at any time by the Club or by any assignee by giving official release notice to the player. It also says this, "This contract is subject to Federal or state legislation, regulations, executive or other official orders, or other governmental action, now or hereafter in effect, respecting military, naval, air or other governmental service which may directly or indirectly affect the player, the club or the league:"

It is a rule of law that when someone is held to having waived his legal rights that the waiver must be clearly established. Certainly, the preponderance of evidence of that waiver must be presented by that one who claims such occurred. If the National Association of professional baseball clubs and the major leagues had desired to make the baseball player's signing this contract a waiver of his Federal rights under the GI provisions of the Selective Service Act, it should have said specifically and in letters large enough that they would not be overlooked that the player waived any right to reemployment for a year or at all under Federal law. Any player reading this contract, I am satisfied, would believe his rights were protected. Personally, after I have read it, I think his rights are protected. No one has the privilege of insisting on writing a contract and then confusing one provision which

says it can be terminated with another provision which says it is subject to Federal legislation without being held to the Federal legislation in favor of the one who did not write the contract.

I recognize that there was some evidence that the Baseball Commissioner represented the players. The players had no right to express any effective voice in his selection. Mr. Niemiec while in the Navy undoubtedly was told repeatedly that results count; and, therefore, the results of the contract are the best way of ascertaining who wrote it. The contract recites first that it cannot be modified. Next, it provides that the player has to play not only for the club with which he contracts but with such assignee as may be selected. He is bound by the rules and regulations of the League of Professional Baseball Clubs. These rules provide for his being drafted. A player might be very happy to live and play in Seattle and on the Pacific Coast, yet he runs the risk of being sold as well as being drafted.

We have heard the terms option and waiver. They are rather reminiscent of chattels. This contract has this language, that this salary of $720 per month does not start until the start of the playing season; it runs to the end of the playing season unless the player is released earlier. He has no right to quit; the opportunity to terminate it is unilateral, but he must report for training before the payment time starts. He gets nothing for that, and after the playing season is over he cannot play baseball or engage in any other athletic sport except upon special consent. His activities are restrained until the following March, at which time the baseball club may, at its wish, renew the same contract for another year. I assume then that at the end of that year it would have again the right to wait from October to March to say yes or no as to whether he works for it or for an assignee or is without a job. His $720 per month, analyzed, is not merely so much as it seems, but on the renewal he gets $720 per month for the playing season only providing the employer is willing to pay it. It is provided that on the renewal of the contract, if the parties cannot agree, that then the salary is to be de-

termined by the executive committee of the employers or by the Commissioner selected by the employers. This contract is not only subject to the rules and constitution and by-laws of the League of which the club is a member, but is subject to all amendments hereafter adopted by the League, not by the players. There are many reasons for those provisions. I would be very unfair to professional baseball if I did not recognize that there is more merit in many of those clauses than seems on first blush. But my analysis is for the purpose of determining whether or not this contract was the contract of the player and the club or was a contract concerning which the player had no voice. There was put in evidence the constitution of the Pacific Coast Baseball League. I think some clauses in it will be very good evidence that the players did not write this constitution. "The objects of this League shall be: * * * (b) to surround it with such safeguards as to warrant absolute public confidence in its integrity and methods. (c) To protect and promote the mutual interests of professional baseball clubs and professional baseball players."

It will be remembered that this contract could be terminated at any time by one baseball club. It must be remembered that the salary for the succeeding option year, in event of dispute, was to be fixed by some one selected by the employers.

This constitution has provisions for terminating membership. They are quite interesting. "This League may terminate the membership of any member and forfeit to this League such member's franchise * * * for the following causes:" There are eleven causes and no others stated. One of the causes is if the club offers, agrees, conspires or attempts to fix the result of any baseball game.

Now, that is one of the most serious crimes known to baseball, the fixing of the game, but even in the event one club fixes the game, let us find the difficulty of suspension. Seven members of the League, the defendant club not voting, must concur unanimously in the findings and decision if a forfeiture be declared. The club can be fined up to a total of five thousand dollars, including any awards to any person

injured or organization hurt, in which event six members, the defendant club not voting, must concur in the findings even as to a fine. Even on such an innocuous provision as to where the club shall meet at its annual meeting, it is provided that the meeting shall be held in such city as decided by a three-quarters vote of the directors.

When we compare that constitution with the contract no one can come to any conclusion other than that it was the contract of the employers. The further evidence is that by the articles of incorporation the purpose of the corporation was to conduct and operate a baseball club or baseball clubs for profit and to acquire and operate amusement projects of any kind or character and all businesses incident thereto.

There is another provision that is interesting. We are confronted generally with a provision that if a person is injured while performing in the service of his employer, he ought to receive compensation for a long period. The regulations which are a part of this contract provide, "Disability directly resulting from injuries sustained while rendering service under this contract shall not impair the right of the player to receive his full salary for a period not exceeding two weeks from the date of his injury, at the termination of which he may be released or continued on the salary roll."

The direct language and all implications are overwhelming to the proposition that this is not a player's contract. Again I say that there are many sound reasons, well recognized by the baseball clubs in this type of competitive venture, which make it reasonable for the clubs to have many provisions which in any other type of employment would be very unfair. But, at least, the contract is the contract of the employers.

The last judicial word upon this act is from the opinion of Justice Douglas in Fishgold v. Sullivan Dry Dock & Repair Corporation, 66 S.Ct. 1105, 1110. In it the Justice says that Section 8 of the act, and particularly subsection (c), "was designed to protect the veteran in several ways. He who was called to the colors was not to be penalized on his return by reason of his absence from his civilian job. He was, moreover, to gain by his service for his country an advantage which the law withheld from those who stayed behind.

"These guarantees are contained in § 8 of the Act and extend to the veteran * * *. He must be restored to his former position 'or to a position of like seniority, status and pay.' * * * He shall be 'restored without loss of seniority' * * *. He 'shall not be discharged from such position without cause within one year after such restoration.' * * * This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. See Boone v. Lightner, 319 U.S. 561, 575, 63 S.Ct. 1223, 1231, 87 L.Ed. 1587. And no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act."

I am mindful of two decisions cited the Court by respondent. One of them is Keim v. United States, 177 U.S. 290, 20 S.Ct. 574, 575, 44 L.Ed. 774. But that decision was not to the effect that the employer was the one to decide that there was some cause known to him that was sufficient for termination. The courts have never said one side to a contract could construe when the other one was no longer entitled to the contractual benefits. That decision was merely to the effect that the courts being of the judicial branch, should not seek to exercise executive authority. That decision was a declaration of the independence of the three branches of government. That decision says: "It has been repeatedly adjudged that the courts have no general supervising power over the proceedings and action of the various administrative departments of government. * * * The interference of the courts with the performance of the ordinary duties of executive departments of the government would be productive of nothing but mischief; and we are quite satisfied that such a power was never intended to be given to them."

It goes on to hold that the appointment by the executive department and the re-

moval from office as part of the power of appointment is necessarily within the executive functions, but this language in that decision is appropriate here, "No thoughtful person questions the obligations which the nation is under to those who have done faithful service in its army or navy."

Mr. Niemiec was a lieutenant in the Navy of a junior grade when he entered. At the time of his separation he had been promoted to that of full lieutenancy. That is testimony in itself of faithful service. In addition, Exhibit No. 1 is the certificate of the Secretary of the Navy to the effect that this petitioner on active duty in the United States Navy during World War II receives "the sincere appreciation of his fellow countrymen for his loyal service."

██ ██ The other case is entitled Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs, reported in 259 U.S. 200, 42 S.Ct. 465, 66 L. Ed. beginning at page 898, 26 A.L.R. 357. In it in 1922 the Supreme Court held that National League baseball was primarily state business or state activity and that the transportation across state lines was so incidental as not to make it subject to the Anti-Trust Act. 15 U.S.C.A. § 1–7, 15. The decision holds, and very properly, that professional baseball is not trade or commerce in the commonly accepted use of those words; and if my recollection serves me correctly, in 1922 the Supreme Court said that life insurance or insurance was not interstate commerce and not subject to the Anti-Trust Act. Professional baseball should not be too certain that some of the recent decisions by the United States Supreme Court would not be the basis for a reexamination of the interstate character of National League professional baseball. However, at the present time I am controlled by the present decision which is to the effect that it is not interstate trade or commerce subject to the Anti-Trust law. But the articles of incorporation prove that it is an activity on the part of the respondent for profit. In view of the great enjoyment it gives the public, it is a very commendable activity for profit or hope of profit. But neither that decision nor the law says or hints that the only employee who is en-

titled to a restoration of his job is the one who happened to work for an institution which was engaged in a type of business which was subject to the anti-trust act. The law says he is entitled to his position for a year. The veteran must be qualified to perform the duties of his position. The evidence shows that he was. The employer may adopt fair and reasonable standards of qualification for work performance. Under the evidence there was no qualification or standard at all. In substance the most Mr. Skiff said was that he had the idea that Mr. Niemiec would not be able to complete the season. He had no right to anticipate Mr. Niemiec's inability until it occurred. The employer may discharge at any time for cause, but that cause must be something other than prediction or hunch of a manager. And where the baseball player and the manager disagree as to the actuality of the cause, in fairness and in accord with the American view point, an independent tribunal must have a right to hear the facts to see whether or not there be cause. To allow the employer to decide that there will be cause in the future to discharge the employee presently is a far cry from the sportsmanship Americans the country over expect from baseball.

Now, actually, the Court would be quite disappointed if it were deciding this case in favor of Mr. Niemiec by virtue of the absence of evidence which could easily have been presented. One who lives in these modern times and does not know more about the baseball league serving his area than I was told in this case, of course, would need to be almost blind, deaf and dumb. The newspapers morning and evening and the radio between times tell me what happens. The league standing of the Seattle baseball team at this time of this hearing was somewhere around .350 or .360. It had lost many more games than it had won. Certainly, the respondent would be delighted if it had continued to win three games out of five. If so, from those things outside the record, all of us know Mr. Skiff would still be manager. Mr. Jo-Jo White would still be with Sacramento. The Sunday morning following the hearing it came to my notice that Mr. White, who under the evidence must be

very closely approaching forty, made five hits out of six and some three runs himself and batted in another for Seattle. Since that time his batting has been phenomenal. My recollection is that Saturday night following the hearing in the morning Mr. York and Mr. Gerbould, playing third and second as I recall it, between them made three errors in one game which Seattle lost; and since that time, as before, Seattle has, unfortunately, not been substantially improving its position with reference to the seven other league teams.

Actually, I know that the baseball commissioner is the selectee of the sixteen major baseball clubs. The minor clubs, including Seattle, accept him and are bound by his decisions without any effective voice known to me. This, of course, is outside the record, but is an explanation that the respondent is not to be blamed or criticized at all for any unilateral provisions in the contract.

The Pacific Coast League and the Seattle club have to take national professional baseball pretty much as they find it, with greater voice than Mr. Niemiec, but perhaps no more influentially.

I recognize the seriousness to baseball of having the judge dictate as to its players. But since it has been argued—and correctly—that baseball is the American game, certainly, then baseball ought to bear its share of any burden in being fair to service men. There are few institutions in American life which ought to feel a greater obligation. If Mr. Niemiec and all the others had failed in their job, there would be no American manager of any baseball if such should be played at the stadium this year. If the Nazis permitted baseball, it would not be an exhibition that any of us liked.

In the National Association Agreement of Professional Baseball Leagues I find this language: "Reinstatement before release—"A * * * National Defense Service * * * player must be reinstated before he can be released unconditionally * * *." Under the language of that regulation, which was made a part of the contract, this petitioner had to be reinstated before he could be released.

The strong implication of that language and of what Mr. Skiff says, that even in 1942 he thought Mr. Niemiec was too old, would at least create this question, was Mr. Niemiec reinstated so that he could be sold if possible and if not, released?

He was placed on the National Defense Roster, which was an acknowledgment that he was entitled to his position. He was reemployed which was an estoppel against the respondent to deny his fitness. The speed with which he was released and the evidence make me wonder if there was not a hope to sell him for more than the salary he would obtain from the start, not of the training season but from the start of the playing season until April 21.

I may say one thing further. I believe under the language of the contract and the law that this respondent team would have had the right in good faith to have assigned Mr. Niemiec to a Class AA ball team which would have played him and paid him at the rate of $575 a month, which was the salary he received when he left for service. But the respondent chose to hire him at $720 under a twenty-five per cent increase, which it dictated—and when I say "it" I mean it and its associates in the employer group; and it chose without cause to terminate his contract.

So he is entitled to the difference between $150 per month received by him for such period as he received it and the $720 since April 21. He is entitled, as I see it, to be restored to the $720 payroll and before a new discharge, in any event, to be given bona fide and sincere opportunity to practice to rehabilitate himself for a reasonable time and an opportunity to prove himself in actual competition with the respondent. I take it that again the right to assign him to a no less than Class AA team, if exercised in good faith, would be the right of the respondent.

Youth must be served, but not at the expense of men who have worn the uniform and contrary to law. Thank you, gentlemen.

Mr. Chadwick: May I inquire—I presume a judgment will be prepared and entered. Would your Honor care to indicate at this time the amount you might ap-

prove as a supersedeas? The balance of the season will be five months, which will involve $3600 if there were no minimizing of damages.

The Court: What do you think, Mr. Durham?

Mr. Durham: I didn't get the question.

The Court: He wishes to know the amount of supersedeas.

Mr. Durham: It is the question of pay from the 21st of April to date and the balance of five more months.

Mr. Chadwick: I am figuring from the 21st of April would be exactly five months to the end of the scheduled season in September.

The Court: What do you think would be proper, Mr. Chadwick?

Mr. Chadwick: I would think that an amount in addition to the $3600 sufficient to cover the costs on appeal; certainly $400 should cover that, and that would be four thousand dollars.

The Court: Do you have any objection to a four thousand dollar supersedeas bond?

Mr. Chadwick: No.

The Court: Well, Mr. Durham, the respondent will still be liable.

Mr. Durham: That is true.

The Court: This respondent is very responsible financially. In addition to that, I am satisfied that it is very responsible morally for any judgment which becomes final. So a four thousand dollar bond would seem adequate to me.

It will be understood by all of you that what I have said has been expressed orally more for the purpose of allowing you to understand my position than with the idea of saying anything that would be appropriately phrased for print. Thank you again and good night.

Mr. Durham: There is just one question; as I understood the ruling of the Court last Monday, the Court stated that the petitioner was entitled to his salary, but he could not compel the club to play him. Now, is this in the alternative?

The Court: Well—

Mr. Durham: I mean it is a matter of the mechanics in drawing up the judgment.

The Court: Well, I will say definitely that under even your contention that the club was to play him, you cannot compel in a competitive sport the manager to play any player. I have indicated that in order for the respondent to start the machinery for discharge for cause in motion it must give him opportunity to play. Under your position I take it that the respondent is authorized to pay Mr. Niemiec without requiring him even to report for training or practice.

Mr. Durham: That was the statement of the petitioner.

The Court: I think the petitioner has so declared himself. But if the respondent wished to restore him to active duty, it could not put him on the payroll and give him no practice or play and then discharge him for inability to perform his duties. So I am satisfied in this instance for a judgment for payment.

Thank you for the third time and good night.