**Thomas Henry CARTER, Appellant,**

v.

**UNITED STATES of America et al.,**
Appellees.

No. 20694.

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 20, 1967.

Decided July 26, 1968.

Petition for Rehearing Denied
Dec. 13, 1968.

Mr. Richard M. Millman, Washington, D. C., with whom Miss Mary M. Burnett, Washington, D. C., was on the brief, for appellant.

Mr. Thomas Lumbard, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Joseph M. Hannon, Asst. U. S. Attys., were on the brief, for appellees.

Messrs. Ralph J. Temple and Lawrence Speiser, Washington, D. C., filed a brief on behalf of The National Capital Area Civil Liberties Union and the American Civil Liberties Union as amici curiae urging reversal.

Before DANAHER, LEVENTHAL and ROB-INSON, Circuit Judges.

LEVENTHAL, Circuit Judge:

Appellant Carter brought an action asserting that his discharge from Government service deprived him of statutory and constitutional rights. He appeals to this court on the ground that the District Court erred when it granted judgment in favor of the Government without a trial.

The facts shown on the record before us are these. Carter was hired by the Federal Bureau of Investigation (FBI) in 1960 as a clerk in its identification division. His employment with the Bureau was interrupted by his enlistment in the Air Force. After completing his military service in 1965 he was reinstated at his old job. In August 1965, the FBI received an anonymous letter complaining that Carter was "sleeping with young girls and carrying on."[1] When questioned about the matter by his supervisor, Carter admitted that a female friend had twice stayed overnight at his apartment. He admitted that they slept together, although not nude, in the same bed, but insisted that they did not have sexual relations. He told his supervisor that the lady had been visiting Washington from out of town for a period of three days, that they had been going together for several years, and that he was seriously considering marriage. On one occasion she had visited at his home in Kentucky and stayed with his brother and sister-in-law.

The supervisor separately questioned each of the three other FBI employees who shared appellant's apartment. One did not know whether the lady had stayed overnight at their apartment. The other two knew she had stayed overnight, but had no knowledge of what had taken place in appellant's bedroom. When questioned, they said they had not heard any noises indicative of sexual relations. They said they had no reason to doubt the account they were told appellant had given the FBI. As one of them put it, "I consider [Carter] as a person of high quality."

Carter was dismissed by the FBI for "conduct unbecoming an employee of this Bureau." Through counsel he petitioned to be permitted to resign, rather than have his employment record marred by such a dismissal. The FBI, on reconsideration, adhered to its prior action. Carter sued for reinstatement and back pay, and served interrogatories. Without answering, the Government pressed a motion for summary judgment, which the District Court granted, holding that appellant was not entitled to a trial.

---

[1]. In full, the letter reads: "Dear Sirs: Would like to make a complaint about a fellow working for the FBI, his name is Tom H. Carter who lives at Kennebeck House or apts; sleeping with young girls & carrying on; it annoys me terrible; I wish you can do something about it. Thank you."

■■ We affirm the District Court's ruling that Carter had no statutory rights to employment under the Civil Service laws [2] or the Veterans Preference Act.[3] However we cannot agree with the District Court's conclusion that Carter was not entitled to a trial to determine whether the discharge violated Section 9(c) of the Universal Military Training and Service Act, 50 U.S.C. App. § 459(c) (1964). We do not rule on appellant's claim of unconstitutional arbitrariness.[4]

■ Because of the exemption of the FBI from the civil service laws, the Bureau is generally free to discharge its employees for any reasons it chooses, subject only to constitutional limitations. Obviously, however, that discretion is subject to any specific limitations that Congress has chosen to impose. This much is conceded by appellee. Thus, like any other employer, the FBI is subject to the provisions of § 9(c) of the Universal Military Training and Service Act by which Congress granted special rights and protections to the returning veteran: the right to reinstatement in the civilian job he held prior to military service; the right to be free in the first year after resumption of civilian life from discharge for other than "cause."

■ The law giving a returning veteran a right to be free of discharge except for "cause" puts on the employer the burden of coming forward with a cause sufficient to justify the discharge. We think Carter has a right to a trial on issues of fact involved in that claim, and to a court determination of that claim in the light of evidence adduced in the courtroom. We now set forth the analysis underlying our conclusions.

■ Carter does not put before this court any prayer for relief embracing his future employment by the FBI. There is, however, jurisdiction in the District Court to consider whether appellant is entitled to clearance of his record from the stigma of the discharge and to damages. We see no valid basis for disclaiming jurisdiction either in the District Court or in this court.[5]

2. At the time of the discharge, federal employees in the "classified civil service of the United States" were protected from discharge "except for such cause as will promote the efficiency of said service." § 6, Act of August 24, 1912, 37 Stat. 555. With slight variations in language, the same rule is stated by the present statute, 5 U.S.C. § 7501. Employees of the FBI, however, had been held to be outside the classified service, on the basis of an administrative construction of a statute providing, "None of the funds appropriated for the Federal Bureau of Investigation shall be used to pay the compensation of any civil-service employee." § 5, Act of July 28, 1950, 64 Stat. 380. That administrative construction has since been affirmed by Congress, 28 U.S.C. § 536 (Supp. II, 1965–66).

3. The Veterans Preference Act limits to "such cause as will promote the efficiency of the service" the grounds for discharge of a "preference eligible" federal employee, 5 U.S.C. § 7512. At the time of the discharge, however, Carter was not preference eligible.

4. It seems plain to us that no discharge could be for "cause" within the meaning of § 9(c) if it were so arbitrary and unreasonable as to violate due process. We therefore need not reach constitutional questions in this case.

5. Jurisdiction lies in the District Court pursuant to 28 U.S.C. § 1346(a) (2).
50 U.S.C. App. § 459(d) provides an express judicial remedy for violation of the reemployment provisions only where there is a "private" employer, but that is not an implied repealer of the traditional jurisdiction of the District Court and the Court of Claims to award damages against the Government. Kephart v. United States, 75 F.Supp. 1020, 109 Ct.Cl. 646 (1948). The House version of the 1948 reenactment of selective service and reemployment rights, H.R. 6401, provided expressly for a remedy in the District Courts to protect federal employees' reemployment rights. See 94 Cong.Rec. 8696. The Senate Bill, S. 2655, had a different scheme, and that version was accepted at conference. Absent some indication in the legislative history, we see no reason for imputing a dislike of judicial remedies into the choice of the better drafted measure.

At oral argument, counsel for appellant conceded that Carter has no desire

## A. The Statutory Background

1. The right of veterans to reinstatement in civilian employment after honorable discharge from the armed forces was established by 1940 legislation.[6] These provisions were reenacted without substantial change in § 9 of the Universal Military Training and Service Act.[7] They reflect an effort "to offer * * * as much protection with respect to reemployment and retention of employ- ment benefits as is within reasonable bounds," 86 Cong.Rec. 10095 (1940) (Remarks of Sen. Sheppard). The law responded to the widespread difficulties that World War I veterans had in read- justing themselves to civilian lives. Peo- ple drawn into the labor force by war- time production needs often kept their newfound jobs, shutting out veterans who needed time to reestablish their skills as well as their stability. Thus, at one time or another more than 200,000 World War I veterans ended up jobless and enrolled in Civilian Conservation Corps camps.[8] That worry over losing a job might have substantial adverse im- pact on the morale of the armed services is plain.[9] Indeed, the morale problem was viewed as the source of Congression- al power to enact reemployment laws writing new terms into private labor contracts beyond the normal reach of Congress. 86 Cong.Rec. 10573 (1940).

This profound social problem of the returning serviceman is partially reme- died by the reinstatement provision of § 9(c). That reinstatement right is buttressed by the further provision that for one year after reemployment a vet- eran has a Federal right that protects him against discharge from his regained job except for "cause." This gives a reasonable period designed to "provide for the rehabilitation of the returning veteran so that he might be equipped to enter a highly competitive world of job finding without the handicap of a long absence from work, as well as to provide for his financial stability for the period of at least one year following his dis- charge from service." Kay v. General Cable Corp., 59 F.Supp. 358, 360 (D.N.J. 1945).[10]

2. The FBI asserts that it had "cause" to dismiss Carter.[11] Essentially the contention is that any FBI employee would be fired for this conduct, and the application of a general FBI personnel policy which does not discriminate against veterans must be upheld unless so arbitrary as to violate due process.

---

to work for the FBI again. Conse- quently, we need not consider whether re- instatement is an appropriate remedy where the FBI is the agency involved.

6. Section 8, Selective Training and Service Act of 1940, 54 Stat. 885 (1940).

7. "§ 459(b) In the case of any such per- son who, in order to perform such train- ing and service, has left or leaves a position (other than a temporary posi- tion) in the employ of any employer and who (1) receives such certificate, [honorable discharge] and (2) makes application for reemployment within ninety days after he is relieved from such training and service * * * (A) if such position was in the em- ploy of the United States Government, * * * such person shall—(i) if still qualified to perform the duties of such position, be restored to such posi- tion or to a position of like seniority, status, and pay * * *."

Section 459(c) provides that "any per- son who is restored to a position [in accord with § 459(b)] * * * shall not be discharged from such position without cause within one year after such restora- tion."

Section 459(g) (1) makes these pro- visions applicable to enlistees.

8. See Andrews, Re-employment and Post- war Planning, 220 The Annals 186 (1942).

9. Thus, present civil service regulations require that employees be told of their reemployment rights at the time of en- tering military service. 5 C.F.R. § 353.105 (1968).

10. See also Marque v. Stern, 88 F.Supp. 306, 308 (M.D.Pa.1950); Niemiec v. Seattle Ranier Baseball Club, Inc., 67 F.Supp. 705, 707–708 (W.D.Wash.1946); Dacey v. Bethlehem Steel Co., 66 F.Supp. 161, 164 (D.Mass.1946).

11. The FBI does not contend that it has been exempted from the operation of the statute. Indeed, Government counsel is to be commended for calling it to the attention of the District Court.

■ A private employer may have the right, in the absence of statute or contract to the contrary, to fire an employee for personal reasons, unrelated to job function, that appeal to the employer, the color of hair, a dislike of men who smoke, or have a tattoo, etc. That does not mean that the employer can fire a returning veteran for the same reason as constituting "cause."

■ Moreover, a policy concerning grounds of discharge cannot be invoked as justification for firing a veteran within the one-year period, even for acts that would lead to discharge of ordinary civilian employees, if the veteran was not given fair notice that the acts constituted cause for discharge.

■ It is settled that veterans protections under the Act should be construed liberally "for the benefit of those who left private life to serve their country in its hour of great need." Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L. Ed. 1230 (1946).[12] A veteran's rights stand especially firm when it is the federal government that is his employer. Congress has been particularly concerned that the federal government lead the way in smoothing the reintegration of veterans into civilian life, and carry out policies that serve as an example for employers generally. This approach germinated in World War I, when federal civil service employees serving in the armed forces were guaranteed reemployment by Act of Congress at a time when no such right was provided against private employers.[13] Moreover, under the

present law the Government cannot invoke the defense available to a private employer that circumstances make reemployment unreasonable. The Supreme Court has explicitly held that the Government-employer is under greater restrictions than a private employer.[14] The requirement that there be "cause" for discharge imposes higher duties on the Government-as-employer than merely abstaining from violation of constitutional rights, a requirement that gives no substantive content to the statute, or merely refraining from discrimination against veterans or the veteran.

■ 3. The "cause" provision was inserted by Congress to provide the reemployed veteran with a protection of reasonableness similar to that enjoyed by a union member protected by provisions in a collective bargaining agreement limiting discharge to cause.[15] The ultimate criterion, whether the employer acted reasonably, is the one generally applied where an employment contract is terminated by an employer because of employee misconduct,[16] and that standard is appropriate under this Federal statute. Kemp v. John Chattillon & Sons, 169 F. 2d 203 (3rd Cir. 1948). We think a discharge may be upheld as one for "cause" only if it meets two criteria of reasonableness: one, that it is reasonable to discharge employees because of certain conduct, and the other, that the employee had fair notice, express or fairly implied, that such conduct would be ground for discharge.

■ Most of the cases decided under this law have involved discharges for vio-

---

12. See also Rix v. Turnbull-Novak, Inc., 260 F.2d 785, 789 (8th Cir. 1958); Mann v. Crowell-Collier Publishing Co., 239 F.2d 699, 701 (6th Cir. 1956); Boone v. Fort Worth & D. Ry., 223 F.2d 766, 770 (5th Cir. 1955); Travis v. Schwartz Manuf. Co., 216 F.2d 448, 454 (7th Cir. 1954).

13. 41 Stat. 142 (1919).

14. See Hilton v. Sullivan, 334 U.S. 323, 331, 68 S.Ct. 1020, 92 L.Ed. 1416 (1948), holding that a "discharge" results from acts of Government-employer even though

such acts by a private employer would not constitute a discharge.

15. See Scoles, Veterans Re-Employment— Statute and Decisions, 31 Iowa L.Rev. 155, 181 (1946); see also Hoyer v. United Dressing Beef Co., 67 F.Supp. 730, 732 (S.D.Cal.1946).

16. 35 Am.Jur., Master & Servant, § 45 at 479 (1941); Dufour v. Continental Southern Lines, Inc., 219 Miss. 296, 68 So.2d 489 (1953); Hoyer v. United Dressing Beef Co., supra.

lation of employer rules or instructions, usually after specific warning.[17] While these have been held to constitute "cause" for discharge under the statute, it is clear that grounds of discharge that do not violate any law when applied to an unprotected employee—say, that the employer dislikes the employee (without having any reason other than intuition, or personality preference)—do not constitute statutory "cause" to fire a returning veteran unless the employer goes further than asserting his own subjective feelings and also meets the burden of showing objective conduct on the part of the employee that satisfies some objective standard of cause. See Cord v. New York Cleaning & Dye Works, 88 F. Supp. 704 (D.Conn.1948).

## B. APPELLANT'S CONDUCT

1. We now consider the issue whether Carter was entitled to a trial on his claim that his discharge was not for cause. We immediately run into the problem that the record does not make clear the exact "cause" of the discharge. The District Judge granted summary judgment on the ground that regardless of whether Carter's action was moral or immoral, he had been indiscreet in carrying on his relationship. The Government's brief also treats the nexus of the case as including: "that appellant's sexual misadventures had become sufficiently public knowledge to cause an anonymous complaint to the FBI" (p. 15).

That theory is not maintainable on the present record so as to support summary judgment without a trial. The only conduct before us on this record was limited to two occasions, and in Carter's own apartment. There is no suggestion here that Carter was notoriously promiscuous, consorted with prostitutes or anything of that sort. Certainly Carter's admitted conduct cannot be equated with that generally "loose" conduct likely to become a matter of public notoriety. The only basis for inferences as to the extent to which Carter's conduct was known outside the circle of his roommates—also employed by the FBI—is an anonymous letter. The letter does not indicate how the writer came to know of Carter's acts. For all that is known, the letter might have been written by an FBI employee.[18] Even if written by someone outside, that person may have been a snoop, voyeur or crank, in which event it would be insubstantial as tending to prove the conduct came to be "public knowledge," much less objectionably notorious. There is good sense as well as fairness in being chary of the anonymous letter.[19]

The FBI may well have made an informed appraisal, or investigation, that permitted it to ascertain that Carter so conducted himself as to turn a private relationship into a public affront. But that is a question of fact and Carter is entitled to a trial of that fact.

2. We turn to the issue whether "cause" for discharge was established as a matter of law by Carter's admitted overnight "necking" and "petting" with his young lady in his apartment on two occasions.[20]

---

17. See, e. g. Fries v. Pennsylvania R. R., 195 F.2d 445 (7th Cir. 1952); Cavanagh v. Pinkerton's Nat'l Detective Agency, Inc., 198 F.Supp. 50 (D.Mass.1961); Pelot v. Schott, 70 F.Supp. 981 (M.D. Penn.1947); Manowitz v. Einhorn Wholesale Grocery, 68 F.Supp. 907 (E.D.N.Y. 1946); Basham v. Virginia Brewing Co., 66 F.Supp. 718 (W.D.Va.1946).

18. The writer of the letter knew enough about appellant to send the letter to the FBI's Identification Division, where Carter worked, rather than to the main FBI office. Moreover, had he been a resident of the same apartment house,

and therefore likely to have observed Carter's coming and going, it is unlikely that he would have misspelled the name of his own apartment building.

19. Cf. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). In re Burke, 87 Ariz. 336, 351 P.2d 169 (1960).

20. On this motion for summary judgment, Carter's allegations that no sexual intercourse took place must be taken as true. Nothing, however, indicates that the FBI disbelieved his persistent denials that he

Behavior that is immoral can be "cause" for discharge. Veterans must conform to the "ordinarily expected standards of personal conduct." [21] The question as to the content of "ordinarily expected standards" of conduct is of a kind normally left to the trier of fact, and is one on which evidence may rightly be tendered. The ultimate issue here, which is interwoven with such questions of fact, is whether the conduct was or should have been known to the employee to be prohibited by the employer.[22]

That knowledge may, of course, rest on fair implication, even though not made express, as in the kind of job-related misbehavior that is inconsistent with proper attention to work or proper loyalty to the employment relationship.[23] But what was known in Carter's case to be prohibited conduct? We do not think it can be said as a matter of law without giving Carter an opportunity to ventilate the facts at trial (including the facts of community standards and FBI standarts), that a reasonable man would know that Carter's admitted conduct was contrary to his employer's rules, as constituting conduct "unbecoming an employee of this Bureau." [24]

Appellant's counsel point out that Carter did nothing more than the "bundling" condoned in Puritan New England. As for more modern precedent, the law is

clear that an unmarried man does not have an "immoral" character for purposes of exclusion from citizenship even if he goes beyond necking and engages in heterosexual relations. Judge Learned Hand pointed out, "we have answered in the negative the question whether an unmarried man must live completely celibate, or forfeit his claim to a 'good moral character.'" Schmidt v. United States, 177 F.2d 450, 452 (2d Cir. 1949).[25]

3. The Government's motion put before the court, as an exhibit, the Handbook for FBI Employees, distributed to all FBI employees. We consider whether that Handbook shows that Carter was put on notice that his admitted conduct was prohibited. The Handbook is a description of the FBI and its work, as well as a "guide" to "help you refrain from doing anything which would in any way detract from the Bureau's reputation or embarrass it in any manner." The sole relevant passage is one stating—"personal misbehavior of Bureau employees reflecting unfavorably upon them or the Bureau, and neglect of duty cannot be tolerated."

The Government invokes the standard of the lady from Dubuque and argues that as the FBI relies on the co-operation of the citizenry it is reasonable to compel moral standards for all employees—clerks as well as agents—that

---

had relations on these occasions, *cf.* McGuire v. United States, 145 Ct.Cl. 17 (1959).

21. This language is from the Handbook Veterans Assistance Program of the Selective Service System, § 306.3.

22. Basic in our jurisprudence is the principle that rules must be known. That principle is fully applicable where the reasonableness of employer action is challenged. Hamilton v. Love, 152 Ind. 641, 53 N.E. 181 (1899).

23. See Meehan v. Macy, 129 U.S.App.D.C. 217, 392 F.2d 822 (1968).

24. Appellee claims (Br. p. 6) that Carter admitted to the investigating agent that his conduct violated the rules and regulations of the Bureau. That agent's statement was only that Carter had said he "had realized it was the wrong thing

to do." Since Carter denies making even this somewhat ambiguous statement, a triable issue of fact is clearly raised.

Carter also alleges: "Throughout the interview and the preparation of the memorandum, Mr. Whitwam conveyed to me the impression that he did not care for this particular aspect of his job, i. e. investigating alleged improper conduct of employees. He also conveyed the impression that he would write up the report in the most favorable light to me and that probably nothing would come of the incident." Assuming that Carter made the statement attributed to him, he may be able to show, from the circumstances, that it was intended as a gesture to help smooth the matter over.

25. See also In re Edgar, 253 F.Supp. 951 (E.D.Mich.1966); In the matter of O, 2 I & N 840, 843 (1947).

would satisfy that most upright lady.[26] Pretermitting the issue whether the standard of the lady from Dubuque would have been reasonable if announced, there is a threshold problem, whether the employees have adequate notice of such a standard. The FBI employees are expressly told in the Handbook that legal gambling is permitted, as is off-duty use of intoxicants, yet these sit poorly with many upright citizens. We do not think a court can deny an employee a trial of the issue on the ground that this Handbook clearly puts FBI employees on notice that they must meet not only the general standards of their own community, but also the special standards of the lady from Dubuque. It should be underscored that the Handbook was not written for FBI agents alone, but is addressed to all FBI employees, including e. g. fingerprint classifiers and file clerks.

4. In short, the burden of justifying a discharge of a veteran where cause is required is on the employer, Cord v. New York Cleaning & Dye Works, *supra*. The question is whether the limitation on private life now asserted to apply to all FBI employees is something the average FBI clerical employee should and does know as contemplated by "ordinarily expected standards of personal conduct." We cannot say that the answer is so clear that Carter is not even entitled to a trial.

5. A further question should be explored at trial. Carter requested that he be given permission to tender his resignation, and this was refused. Even if it should be found as a fact that Carter's admitted conduct provided cause for terminating his FBI employment, that would not necessarily mean that the "cause" was sufficient to warrant rejection of his proposed resignation and insistence on the stigma of a "discharge" from the FBI, especially if Carter established that he had no subjective awareness that his conduct violated FBI standards. Where Government employment is involved, the label which serves as the reason for leaving it may have important consequences for obtaining future employment. At least we cannot hold as a matter of law on this record that it has no such consequence,[27] and that the complaint must be dismissed for that reason. The employee's readiness to resign must be taken into account in considering whether his conduct was so offensive as to give the Government "cause" under section 9(c) to reject the resignation and insist that he be formally discharged. This is consistent with the language of the statute, and in furtherance of its purpose of protecting the veteran.

26. "[The FBI] cannot allow the little old lady from Dubuque, for whom Harold Ross did not edit the New Yorker, to withhold information * * * because she will not trust an organization whose agents and employees are allowed to 'sleep with young girls and carry on.'" Brief for Appellee at 27, citing Thurber, The Years With Ross (1959).

27. The FBI contends that its employee standards are well known to be very high; and that persons dismissed from the FBI for unbecoming conduct will be hired by other employers, most of whom do not expect as much.

The fact that an FBI dismissal is not fatal does not mean it is not an impediment. The affidavits in the record tendered on behalf of Carter state that when he applied to a local bank for a job the personnel director asked him to provide statements from his roommates corroborating his account of why he was discharged from the FBI. They furnished such statements, and were subsequently advised by the FBI that they had thereby violated the FBI regulation which forbids an FBI employee from commenting to an outside source concerning any other employee of the FBI, past or present. One resigned in a few days. The other was transferred from his work as file clerk to polishing cabinets in the file room. After 13 days at that assignment, he tendered his resignation.

Obviously the fact that Carter was finally able to get a job with a local bank by no means establishes that the stigma of dismissal will not be harmful to him either by depriving him of opportunities with other potential employers, or as depriving him of better opportunities with this bank, now or in the future.

The order of the District Court is vacated and the case remanded for further proceedings.

So ordered.

DANAHER, Circuit Judge (dissenting):

Let it be observed immediately that the sitting division is unanimous in concluding that this appellant was not entitled to the procedural protections against discharge of the Veterans Preference Act, as amended, 5 U.S.C. § 863 (1964), or the Lloyd-LaFollette Act as amended, 5 U.S.C. § 652. He never had Civil Service status.[1]

Next, let it be noted, he does not seek reinstatement to his former position; although in his complaint he stated that he had been "irreparably harmed in all his future job opportunities" because of the allegedly unlawful discharge, his own affidavit shows that he lost scant time in securing a position with a local bank.

Rather, he is asking this court to place its imprimatur on his conduct, arguing through counsel that the appellant can not be faulted for engaging in "perfectly normal sexual activities * * * which Mr. Kinsey in his Report has calculated about 90 per cent of the male population engages in." He supports that contention by supplying Chapter 16 of The Sexual Behavior in the Human Male by Kinsey, Pomeroy and Martin entitled "Heterosexual Petting," an exhibit in the District Court.

The District Judge was unimpressed, just as had been the Bureau officials. I range myself with them. To the extent that it is suggested that we may exercise a discretion in the matter I would deny relief. Let us see just what happened.

Following military service, this appellant was notified that he was eligible for reinstatement as a fingerprint clerk, Grade GS–4, in the Identification Division of the Federal Bureau of Investigation.[2] As of August 26, 1965, he was informed that he was being dropped from the rolls of the Bureau "in view of your conduct unbecoming an employee of this Bureau." [3]

This court on many occasions has recognized the principle that the power to remove inferior Government employees is an incident of the power to appoint them, following the statement in Myers v. United States, 272 U.S. 52, 161, 47 S. Ct. 21, 71 L.Ed. 160 (1925). Put another way the interest of a Government employee in retaining his job can be summarily denied. "It has become a settled principle that government employment, in the absence of legislation, can be revoked at the will of the appointing officer." Cafeteria and Restaurant Workers etc. v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961); Vitarelli v. Seaton, 359 U.S. 535, 539, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). No matter who has stated the law, no one has said it better than Mr. Justice Reed speaking for the Court of Claims in

---

1. As of March 22, 1960, he had been offered a probationary appointment in the Bureau as a clerk. He then was informed that his continued employment "would be contingent" upon his "maintaining a satisfactory record. Positions in the Federal Bureau of Investigation are excepted by law from the competitive Civil Service, in view of which your acceptance of this appointment will automatically constitute relinquishment during your tenure of any such competitive status you may have acquired."

2. Between May 22, 1961 and May 21, 1965, the appellant had served in the United States Air Force. He thus became entitled to restoration to his former position

pursuant to the Universal Military and Training Service Act, 50 U.S.C. App. § 451 et seq. (1964), and was not to "be discharged from such position without cause within one year after such restoration," § 459(c) (1).

3. The Handbook for FBI Employees (1964) provides:
   "Personal misbehavior of Bureau employees reflecting unfavorably upon them or the Bureau, and neglect of duty cannot be tolerated. Any such misconduct or any neglect of duty or allegations of such nature must be promptly reported to the Bureau by any employee learning of it."

Batchelor v. United States, 169 Ct.Cl. 180, 183, cert. denied, 382 U.S. 870, 86 S.Ct. 147, 15 L.Ed.2d 109 (1965), where we read:

> "The Supreme Court in Keim v. United States, 177 U.S. 290 (1900), considered the question of whether or not the courts may supervise the acts of an executive department head in discharging an employee. The Court's decision in that case clearly placed the removal of executive department employees within the ambit of executive discretion, and ruled that until Congress, by 'special and direct legislation makes provisions to the contrary,' the courts cannot review the soundness or propriety of the exercise of the department head's discretion. This case stands as a solid milestone in a long line of unbroken authorities holding that where there are no established procedures or statutes to be followed, removal of an employee is solely within the discretion of agency officials and accordingly may be effected without giving reason. See Cafeteria Workers v. McElroy, 367 U.S. 886, 896–97 (1961) and cases cited therein."

Were there no more, the Bureau's action clearly would have been comprehended within the principles thus stated. Here, however, some would say that "cause," the "personal misbehavior" and "misconduct" referred to in the Handbook for FBI Employees [4] is not to be equated with or deemed adequate as measuring the "cause" specified in section 459(c) (1) of the Act.[5] Some would say that Carter must be given "an opportunity to ventilate the facts at trial," my colleagues taking the position apparently that only thus can it be determined that a "reasonable man would know that Carter's admitted conduct" was contrary to his employer's rules as constituting conduct "unbecoming an employee of this Bureau."

What facts would they "ventilate"? Even as they observe that the conduct in question was "admitted" ?

The "facts" as to that conduct were supplied by the appellant. Obviously, his superiors were entitled to draw from the facts of the "admitted conduct" such reasonable inferences as naturally flow from such facts. I venture to suggest that in scores of cases, month after month, throughout the courts of this land the facts "admitted" here give rise to judicial action culminating in a decree of divorce, with its attendant consequences. Cause?

Here, the record shows, four FBI employees shared an apartment with two bedrooms. Usually, the appellant shared a bedroom with one of his fellow FBI employees. Some shifting in arrangements within the menage became necessary on the evening of August 15, 1965. At least one employee had to give up his bed and join the other two as the quarters were reassigned. All three knew that this appellant brought a young lady to the apartment.[6] She stayed there all night August 15th and again all night August 17th. On those nights, in Carter's own words, in his own handwriting, he stated: "We slept in the same bedroom and in the same bed." The appellant told an inquiring Special Agent that each night the girl had worn night clothes, while on one night he had worn Bermuda shorts and a tee shirt and on the other, had worn Bermuda shorts and a sport shirt. He added that on the intervening night of August 16th, with permission from an apparently complacent relative, he had slept at a different apartment, with the young lady on a couch while he slept on the floor.

It has been contended that the discharge of the appellant was arbitrary and unlawful as an "invasion of his privacy." On brief he argues that his right is protected by "the life, liberty and pur-

---

4. *Supra* note 3.

5. *Supra* note 2.

6. The statements to the Special Agent supplied by Carter's fellow FBI employees, his usual roommates, substantially corroborated his own version of the events under discussion.

suit of happiness guarantees which are fundamental in our free society." But it is difficult for me to assume that our society is that "free" or that such "pursuit" remains private when the occasions involved the collaboration of his three fellow FBI employees in perfecting the arrangements. Then there was the relative whose apartment provided the locale in another instance.[7] And some other person—if not one of those mentioned—wrote a letter to the Bureau touching upon the situation, the explanation respecting which was supplied in detail by Carter himself. I would not have expected the term "privacy" to have been so expansive. And to the extent that Bureau officials and finally the Director deemed the conduct unbecoming, Carter—not the FBI—had provided the cause for his dismissal.

It has been intimated that Carter could not have known the conduct deemed "unbecoming an employee" was improper. His attorney writing to the Bureau in his behalf on September 13, 1965 seems to have been under no misapprehension. Counsel's letter stated, in part:

> "The conduct deemed 'unbecoming' apparently was due to the fact that Mr. Carter had a young lady, whom he had known for some time and who had flown in from Texas to visit in Washington, in his apartment over night. Mr. Carter was questioned about this immediately after it occurred, and *he himself told exactly what happened.* His own statements, however, were used against him as on the basis of them he was discharged without notice and without being given the opportunity to resign." (Emphasis added.)

It has been suggested that the Handbook for FBI Employees is not sufficiently specific in pointing out that the Bureau can not tolerate personal misbehavior of its employees "reflecting unfavorably upon them or the Bureau." It is true that the Handbook does not say that an FBI employee may not use profane and obscene language in denouncing his superiors in the presence of others. A fingerprint clerk is not enjoined against mocking or vilifying a police officer who brings in a "lifted" fingerprint for classification in furtherance of cooperation with the Bureau. Myriad examples of unspecified misbehavior will suggest themselves. Something is lacking, it is argued, in that the Handbook did not particularize with respect to any such illustration, or by way of denouncing the very conduct under discussion here, admitted by Carter who "told exactly what happened." If an employee of the Bureau did not know that he was expected to comply satisfactorily with "ordinarily accepted standards of personal conduct,"[8] I would suppose he did not belong in the Bureau in the first place.[9] Were I required to do so, I would rule that the Director had ample cause for dismissing Carter.

Taking the facts disclosed on this record by Carter and his roommates, even without recourse for present purposes to the affidavits of other Bureau employees, I do not agree that this appellant, whether or not "red blooded" (as his counsel puts it), is entitled to reversal. He does not seek reinstatement. This court should decline relief rather than award the appellant an opinion that his admitted conduct is to be the subject of a

---

7. Shortly thereafter, someone anonymously wrote to the Bureau tendering a complaint and expressing annoyance concerning the appellant's conduct. Such was the situation when a Special Agent interviewed Carter in the course of which Carter "ventilated" the facts and presently wrote out and submitted his explanation which I have summarized.

   News of such circumstances gets around, we may fairly assume.

8. Handbook Veterans Assistance Program of the Selective Service System as referenced in Kemp v. John Chatillon & Sons, 169 F.2d 203, 207 (3 Cir. 1948); and see *id.* 206, quoting Judge Minton in defining "cause" to be such "as a fair minded person may act upon," and n. 6 pointing out that Judge Minton when a Senator had been one of the managers of the very legislation here considered.

9. Perhaps that is what the Director concluded, too.

trial to be judged by community standards as to permissible limits of heterosexual activity. I would dismiss the appeal.

### Supplemental Opinion

LEVENTHAL, Circuit Judge:

■■ Two of the points made in appellees' petition for rehearing merit an additional word. First is the request that we reconsider our ruling on jurisdiction. Appellees apparently agree that the Government is like any other employer in being prohibited by Congress from discharging a veteran except for cause within the year after his return. Appellees argue, however, that there is no jurisdiction in the District Court in a case of wrongful discharge by the Government. In essence appellees are arguing that Congress meant to provide a right without a judicial remedy. It would take express language to lead us to conclude that Congress intended such an anomalous result.[1] It would be contrary to the extreme solicitude Congress

has manifested for the returning veteran, and its efforts to put the Government-employer in the foreground of those efforts. The contention, if sound, would confront all employees of the Government returning from military service. True, the statute (§ 9) [2] provides that the Civil Service Commission shall have jurisdiction to order a veteran's reinstatement in the public sphere, and does not refer to the possibility of a judicial order. But the appropriateness of a judicial order for reinstatement of a veteran, not ordered by the Commission, certainly raises special issues, of possible clogging of the wheels of government. But so far as actions for damages, or declaratory and equitable relief, are concerned, we see no basis for concluding that Congress intended to override and remove customary judicial remedies.[3] The contention that Congress intended a right without any judicial remedy is neither expressed in the statute, nor supported by the legislative history [4] or cases cited by the Government.[5] We think the contention is unsound.

1. *Cf.* Jones v. Mayer Co., 392 U.S. 409, 414 n. 13, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

2. 50 U.S.C.App. § 459(e) (1964).

3. *See* Kephart v. United States, 75 F. Supp. 1020, 109 Ct.Cl. 646 (1948).

4. The Government adverts to the failure of Congress to enact the House version of 9(c). H.R. 6401, which provided that an aggrieved government employee should initially seek an administrative remedy—compensation and restoration—with judicial relief to be available when an "agency refuse[d] to take the corrective action recommended by the Commission." 94 Cong.Rec. 8696. The bill conferred jurisdiction to "require specific compliance with the recommendation" and to enter a judgment for damages. The fact that this version was rejected by the conference in favor of the Senate version provides no meaningful support for appellees' argument. What the House had provided was a suit to enforce the Government's determination, not to vacate it—and that involves wholly different considerations.

It may well be that the Congress decided, on further reflection, that it was so unlikely that an agency would defy the Commission as to make it unnecessary to require explicit provision for that contingency. The conferees may have wished to leave it to courts to determine whether and in what circumstances equity should take jurisdiction in furtherance of the public interest, to enforce the Commission's award. The courts had long since announced the doctrine establishing equitable jurisdiction in furtherance of the public interest, to *enforce* an administrative award even in the absence of express statutory provision therefor. *See,* e. g., Virginian Ry. Co. v. System Fed'n No. 40, 300 U.S. 515, 549–551, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

5. In both Campbell v. Deviny, 81 F.Supp. 657 (1949), aff'd, 90 U.S.App.D.C. 176, 194 F.2d 881 (1952); and Insular Police Comm'n v. Lopez, 160 F.2d 673 (1st Cir.), cert. denied, 331 U.S. 855, 67 S.Ct. 1743, 91 L.Ed. 1863 (1947), the amount in controversy did not meet the $3000.00 jurisdictional minimum. Congress has since vested the district courts with jurisdic-

■ Appellees also urge for the first time, on petition for rehearing, that the determination of any factual issues arising out of the remand in this case must be made in the first instance by the Civil Service Commission. This is a switch from the Government's prior submission, which sought to emphasize the FBI's independence of the Civil Service Commission. The Government relies on section 9(e) which refers to the Commission cases where an employee seeks restoration to a position under section 9 (b). Section 9(e) involves precisely the determination—of placement in the federal service—which we agree lies outside the judicial remedies. These determinations require the executive expertise that the Commission has developed in the course of administering its other statutory duties. See footnote 2 to original opinion. They are plainly distinguishable from actions for damages or equitable relief, especially where the agency involved is not normally within the cognizance of the Civil Service Commission.

Petition for rehearing denied.

DANAHER, Circuit Judge (dissenting):

In my dissent from the original opinion, I had already sought to make clear my view that the case was being decided erroneously. I now observe only that nothing presently said seems to establish a firmer foundation for the position reached by the majority. Rather, the Supplemental Opinion serves to reemphasize the existence of areas respecting which we should have the benefit of oral argument.

I would grant the Government's petition for rehearing.

tion in suits against the Government for less than $10,000. 28 U.S.C. § 1346(a) (2) (1964).

The discussion of mandamus in these cases is rooted in their context of the employee's prayer for a judicial action placing him in the federal service. Our opinion was careful to exclude that remedy from the permissible scope of the litigation before us.