John W. SIMMONS, M.D.

v.

Albert R. DIDARIO, et al.

Civ. A. No. 91–6719.

United States District Court,
E.D. Pennsylvania.

April 14, 1992.

Rosalind M. Plummer, Philadelphia, Pa., for John W. Simmons, M.D.

Claudia M. Tesoro, Office of Atty. Gen., Philadelphia, Pa., for Albert R. Didario, Superintendent, Norristown State Hosp., Karen F. Snider, Acting Secretary, the Dept. of Public Welfare of the Com. of Pennsylvania and Com. of Pennsylvania.

MEMORANDUM

DALZELL, District Judge.

This Kafkaesque case involves a United States Air Force colonel who returned from service in Operation Desert Storm to find that he was suspended without pay at his civilian job because of charges that, to this day, have never been made against him. Rather than defend his innocence against these unknown, and later unmade, charges, Dr. John W. Simmons brought this action against his former employer, pursuant to

the Veteran's Reemployment Rights Act, 38 U.S.C. § 2021, *et seq.*

Congress specifically conferred jurisdiction on the district courts to entertain such actions under 38 U.S.C. § 2022. We also have subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

After a two-day non-jury trial, we on April 10 stated in open court our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). This Memorandum will amplify and supplement those Rule 52 findings and conclusions.

John W. Simmons, M.D., is a citizen of the United States and a licensed medical doctor. At all relevant times, he was a member of the Reserves of the United States Armed Forces. In 1990, Dr. Simmons, then 57 years old, was the highest ranking Air Force Officer at the Willow Grove, Pennsylvania, Air Reserve Facility.

*Dr. Simmons's Pre–War Civilian Employment*

Dr. Simmons has been an employee of the Commonwealth of Pennsylvania since 1968 and, since October 11, 1989, has served as Acting Director of Medical Services at Norristown State Hospital. Norristown State Hospital is operated under the auspices of the Department of Public Welfare of the Commonwealth of Pennsylvania.

Dr. Simmons's work as Acting Medical Director and, prior to that, as Assistant Medical Director has always been exemplary. For example, Dr. Simmons's last Performance Evaluation Summary Report (Exhibit P–17), which defendant Albert R. DiDario, the hospital's Superintendent, signed on August 31, 1990, rated Dr. Simmons as exceeding standards in planning and directing, as well as in the quality and quantity of his work. It is worth noting that, in the narrative of the "quality" section of this performance appraisal, the comments addressed to Dr. Simmons state:

> The quality of your work is exceptionally good. You keep current thru frequent CME [Continuing Medical Education] sessions, share your knowledge with your staff at department meetings and are respected for your knowledge and skill as a physician-administrator.

The "quantity" section of the appraisal, which also states that Dr. Simmons "exceeds standards", goes on to say:

> Your production is also excellent. You are a self-starter, display initiative, yet at the same time are a team player, keep your supervisor informed. You are willing to put in what time it takes to get the job done.

The Medical Director who preceded Dr. Simmons at Norristown State Hospital was Bruce Edward Carlson, M.D., whose testimony was received in evidence as Exhibit P–14, being the transcript of his deposition of March 5, 1992. Attached to Dr. Carlson's testimony as Exhibit P–2 was the prior Performance Evaluation Summary Report about Dr. Simmons, dated February 1, 1989. After rating Dr. Simmons as exceeding standards in many areas when Dr. Simmons was Assistant Medical Director, Dr. Carlson stated, in the comment section of the appraisal:

> Dr. Simmons is an excellent clinician and an extremely reliable clinician. His dedication to his patients and his ability to complete large volumes of work related to committees and special assignment are definite assets. His determination to implement quality assurance programs is obvious. He is always ready to assist the undersigned in providing coverage and developing new programs as needed.

In the fall of 1990, a new Assistant Superintendent for Clinical Services was installed, Linda F. Kunst, M.D. Dr. Kunst, a psychiatrist, was said by Dr. Carlson to be "a very difficult person to work with, no question about that". Carlson N.T. at 19–20. Dr. Kunst soon became the subject of three employee formal grievances in just one month, one of them filed by a Dr. Rita Hanley, who ultimately took Dr. Simmons's job as Acting Medical Director while he was serving in Operation Desert Storm.[1]

---

**1.** A pharmacist, Mr. William Brennan, and a laboratory assistant, Valeria Call, also filed grievances against Dr. Kunst.

These grievances were filed because the employees alleged that Dr. Kunst was asking them to do what they regarded as improper tasks.

Hours before leaving for active duty in connection with what was then called Operation Desert Shield, Dr. Simmons attended a meeting with Dr. Kunst and Mr. DiDario. By the testimony of all three individuals, the meeting was not a success. Dr. Kunst and Mr. DiDario insisted that Dr. Simmons provide additional material on medical quality assurance issues, notwithstanding the fact that he had done so previously, and, as noted above, was highly regarded in that area by Dr. Carlson. Dr. Simmons was asked to deliver these additional submissions in twenty-four hours. Dr. Simmons strenuously objected to this demand, noting, among other things, the fact that for long periods of time he did not have a secretary and was short of support staff. Mr. DiDario in his testimony agreed that Dr. Simmons's complaint about lack of support and secretarial staff was well-founded. The meeting ended abruptly, and unsatisfactorily from the point of view of all concerned.

*Events During Military Service in Operations Desert Shield and Desert Storm*

On November 29, 1990, Dr. Simmons by letter informed the Director of Personnel at the hospital that his reserve unit was being deployed to the Persian Gulf area, and he requested military leave without pay. The Commonwealth ultimately confirmed Dr. Simmons's military leave status by a letter dated April 24, 1991, which also informed him that he would be entitled to a $400.00 monthly stipend Governor Casey had allocated for returning veterans of the Persian Gulf operations. Within days of his departure from the hospital, Dr. Simmons commenced his service first at Willow Grove and, later, in the Persian Gulf area itself.[2]

Dr. Simmons's service during Operation Desert Storm took him to Oman and, later, Saudi Arabia. At one point, he served within fifty miles of the Kuwait border, where he was responsible for the health of approximately 20,000 Iraqi detainees. His service in the Gulf region earned him the South West Asian Medal, a Bronze Star and the National Defense Medal. Dr. Simmons also anticipates receiving a decoration from the Kingdom of Kuwait for his service in its liberation.

It is undisputed that, from the time Dr. Simmons left the hospital until he returned to work on July 29, 1991, he was at all times serving "at the request and for the convenience of the Federal Government" within the meaning of 38 U.S.C. § 2024(b)(2).

On June 6, 1991, Dr. Simmons wrote to the Director of Personnel at the Hospital to inform him that Dr. Simmons expected to be free of his reserve duties and would return from his military leave immediately after July 26, 1991.

While Dr. Simmons was serving his country, his former colleagues were not serving him. For reasons never explained in her testimony, Dr. Kunst on February 1, 1990, wrote a letter to Dr. Simmons, addressed to his home, which acknowledged that he "may have disagreed with [her] process and methods" and acknowledged that she had "backed [him] into a corner and did not help [him] to work out of it." Exhibit P–19. When asked at the trial what she meant by these terms, and about the reference, later in her letter, to working "to modify those unhealthy elements", Dr. Kunst was unable to state what she meant.[3]

---

2. The Department of the Air Force, Headquarters Air Force Reserves at Robins Air Force Base, Georgia, issued Special Order G–16, dated December 4, 1990, which confirmed the order of the Secretary of the Air Force, effective "on/about 16 November 1990" that it was activating certain Tactical Hospital units, among them Dr. Simmons's 913th Tactical Hospital unit that, effective November 1, 1990, was redesignated the 913th Medical Squadron. *See* plaintiff's Exhibit P–7, p. 2.

3. Dr. Kunst never explained why she composed this letter over two months after Dr. Simmons left for military service, but her fugue of evasive answers and memory lapses to questions pertaining to it lead us to find that the superficially-conciliatory tone of the letter was, in truth, a rather artless prolegomenon to the drama she

In late May of 1991, less than three months after the Iraqi cease-fire, Dr. Kunst personally supervised the removal of all of Dr. Simmons's papers from his working office on the second floor of the building where Dr. Simmons had worked. Dr. Kunst was apparently sufficiently sensitive about this enterprise that she had hospital security personnel present and, it appears, a photographer duly documented the enterprise. Dr. Simmons had also had an office on the first floor of the same building, but by this same time his old office was occupied by Dr. Rita Hanley, who Dr. Kunst had installed as Acting Medical Director. Thus, by the end of May, 1991, there was literally no place left in the hospital for Dr. Simmons.

### The Return to Civilian Life

When Dr. Simmons returned from Operation Desert Storm, on Monday, July 29, 1991, he went to the office of Frances J. Clifford, Director of Personnel at the hospital, and delivered his discharge papers, as well as a copy of his orders through July 26, 1991. His discharge papers documented the fact of Dr. Simmons's honorable discharge from military service. Dr. Simmons could see immediately that something was wrong, because he was treated, in his words, "as though I was leprosy." He was given no papers to sign, but was apparently informally advised that he was being suspended without pay. He was, however, given no documentation of this fact.

Understandably outraged at this "welcome", Dr. Simmons drove to Harrisburg to seek relief from the Secretary of Public Welfare, but to no avail.

On July 31, 1991, Dr. Simmons received a certified letter, ostensibly from Mr. DiDario, but signed by Dr. Kunst. The sole reason given in the letter for the suspension without pay was:

> The Investigation of possible Impropriety in the Operation of the Pharmacy Department for which you have Managerial Responsibilities. [Defendants' Exhibit D–2].

directed beginning in late May of the same year with the ceremonious purgation of Dr. Sim-

On August 6, 1991, Mr. DiDario called Dr. Simmons to arrange a meeting for August 13, at which Mr. DiDario said the "investigation" would be discussed. Dr. Simmons inquired as to what, precisely, he was charged with, but Mr. DiDario declined to go beyond on the Delphic statement in the July 29 letter.

Dr. Simmons duly attended a meeting at the hospital on August 13, and was introduced to Ms. Cyrise Dixon, of the Pennsylvania Inspector General's Office, and Ms. Dixon's colleague, Ms. Jeannie M. Daniels. After some delay, Dr. Simmons was shown a folder that had his name on it. At this, Dr. Simmons asked for permission to record the meeting, since he was unrepresented by counsel or any other advisor. Ms. Dixon made a phone call to inquire about this subject, but ultimately told Dr. Simmons that he would not be allowed to tape record the proceedings. She said he was allowed to take notes, but Dr. Simmons declined to proceed. On this occasion, no allegation of any kind was made that Dr. Simmons was responsible for any possible wrongdoing at the pharmacy.

### The "Investigation" and the Pretextual Termination of Dr. Simmons

At this point it is important to canvass the nature of the investigation that was the supposed basis for Dr. Simmons's suspension without pay. According to the testimony of the Special Investigator from the Pennsylvania Inspector General's Office, Cyrise L. Dixon, her office had heard from a part-time pharmacist at the Norristown State Hospital Pharmacy that the former Chief Pharmacist, George Behm, had directed drug salesmen to deliver samples of their wares to Mr. Behm's home. Ms. Dixon reported that the period of alleged impropriety at the pharmacy began in February of 1988 and ended in February of 1990, when Mr. Behm went on extended medical leave. Ms. Dixon stated that approximately twenty people were interviewed, ten of them being employees of the pharmacy. She never spoke with Mr. Behm.

mons's working office and installation of Dr. Hanley in Dr. Simmons's job.

Significantly, *no one* was ever charged with any offense arising out of this investigation. According to Ms. Dixon, the only person who would have received any disciplining would have been Mr. Behm himself, who would have received a reprimand had he not retired from service to the hospital.

It is also notable that Mr. DiDario and Ms. Dixon both testified that the reason Dr. Simmons was suspended[4] was that because, as Acting Medical Director, he had administrative responsibility for the pharmacy, although this was, clearly, one of his least concerns. The July, 1990 Master Organizational Chart of the hospital, which was Exhibit P–1 to Dr. Carlson's testimony, showed that Dr. Simmons was also responsible for the X-ray, Laboratory and Physical Therapy Departments, as well as M & S Records and clinics, in addition to the pharmacy. It is undisputed that Dr. Simmons, throughout his tenure, also continued to see patients.

In all of the testimony received, no one mentioned the fact that Dr. Simmons only served as Acting Medical Director from October of 1989, and, therefore, for at most five of the twenty-four months in question. There was no testimony that, for example, Dr. Carlson was questioned, much less suspended without pay, even though he was Medical Director for by far the longest period of the relevant time, and therefore was also responsible for the operation of the pharmacy. The apparent failure to talk with Dr. Carlson is surprising, since Dr. Carlson made it clear in his testimony that the chief of the pharmacy, Mr. Behm, did whatever he could to "bypass" John Simmons, for reasons best known to Mr. Behm. Carlson N.T. at 17–18.

Thus, although the investigation ultimately proved to be of little significance to anyone, it was of profound importance to Dr. Simmons. Viewing all of the evidence, we could only conclude that Dr. Kunst and Mr. DiDario seized upon this purported "impropriety" as a pretext to justify getting rid of Dr. Simmons in favor of Dr. Hanley, who assumed Dr. Simmons's job while he was on military leave.

Besides all of the foregoing reasons, other circumstantial evidence supported our finding that Dr. Simmons was, as he feared, being "set up" for the termination that ultimately came in September of 1991. For example, we found that a letter that Mr. DiDario sent to Dr. Simmons, dated August 21, 1991, Defendant's Exhibit D–3, was calculated to force Dr. Simmons into an administratively indefensible position. This letter went far beyond its reference to "your possible involvement in irregularities in the operation of the hospital Pharmacy." The letter for the first time added that, "The investigation has since been expanded to include alleged misrepresentation concerning your military orders validating your absence from this hospital and your status in support of military operations in the Middle East." This supposed expansion of the "investigation" was, according to the testimony of Ms. Dixon, nothing more than her not fully understanding the distinction between active duty with military pay and active duty without military pay, since, apparently, Dr. Simmons had served several days at Willow Grove without active duty pay.[5] As noted earlier, however, it was undisputed that, from November 30, 1990 through July 26, 1991, whether on active duty pay or serving voluntarily Dr. Simmons did so "at the request and for the convenience of the Federal Government."

This August 21 letter did not stop at these subjects, however, but also for the first time demanded that Dr. Simmons complete a "Statement of Financial Interest"

---

4. Both Ms. Dixon and Mr. DiDario agreed in their testimony that the decision to suspend Dr. Simmons was solely that of the hospital's senior management, *i.e.,* Mr. DiDario and Dr. Kunst.

5. Plaintiff's Exhibit P–7 documents that, with the exception of a few days in December, 1990, and January, 1991, Dr. Simmons was receiving active duty pay. Dr. Simmons testified that these gaps were the result of funding issues in Washington caught up in what ultimately led to Congress' formal Declaration of War in January. From his testimony, it was clear that Dr. Simmons was engaged from the moment he arrived at Willow Air Reserve Facility in the build-up for what ultimately became the war with Iraq.

and "Code of Conduct" forms that were transmitted with the letter. These ten pages of printed forms were demanded to be completed within the few days Dr. Simmons would have before the August 27 meeting to which the letter summoned him.[6] To add measure, Mr. DiDario stated that Dr. Simmons's "Failure to complete these forms will result in termination of your employment." Mr. DiDario admitted in his testimony that he knew Dr. Simmons could not have filled out the forms while he was serving in Operation Desert Shield/Desert Storm, but that he thought he would just raise the subject since he was talking about everything else.

The letter also demanded that Dr. Simmons attend a meeting on Tuesday, August 27, as part of a "continuation of the investigatory process." He was told to attend the meeting "and to cooperate" or else he would be considered in "gross insubordination" that could result in the termination of his employment.

Notwithstanding the peremptory nature of the August 21 letter, Dr. Simmons telephoned Mr. DiDario on Friday, August 23, to state that the meeting time was inconvenient owing to his commitment to help his daughter move in the District of Columbia. As they chatted, Dr. Simmons came to the conclusion that Mr. DiDario was goading him, but Dr. Simmons maintained a respectful tone. Mr. DiDario recalled that Dr. Simmons objected in this conversation to what Dr. Simmons called "a witch hunt."

When we asked Mr. DiDario whether, as of the time of trial, he believed that Dr. Simmons was involved in any impropriety of any kind, Mr. DiDario admitted that he did not think so. He also admitted that no other employee at the hospital was ever suspended, with or without pay, in connection with the investigation.

*Legal Conclusions*

■ In their apparent haste and intensity to drive Dr. Simmons out of Norristown State Hospital, Dr. Kunst and Mr. DiDario

failed to comply with Pennsylvania administrative procedures in connection with suspending employees. As we found in open court, Title 4 of the Pennsylvania Code, at § 105.3, provides, in relevant part,

§ 105.3 **Statement of Reasons.**

Notices of removal, resignation by abandonment, involuntary retirement, involuntary demotion, or suspension issued to regular employes shall include a clear statement of the reasons therefor, sufficient to apprise the employe of the grounds upon which the charges are based.

Obviously, the July 29, 1991 letter did not begin to provide Dr. Simmons with "a clear statement of ... the grounds upon which the charges are based" and, indeed, all of the witnesses at trial admitted that no such grounds could be given to this day because none exist.

In his testimony, Mr. DiDario tried to minimize the significance of the suspension without pay, and even went so far as to say that it was not a disciplinary matter. By contrast, we received defendant's Exhibit D–7, which is the current version of Section 7174 of the Pennsylvania Department of Public Welfare Personnel Manual (reissued April 20, 1988). Section 7174 is entitled, "Discipline". Subsection 7174.3, entitled "Disciplinary Program", includes, at page 5, a page entitled, "Suspension Letter". From a comparison of the sample letter in the DPW Personnel Manual, the July 29, 1991 suspension letter is a very close, though not verbatim, version of the sample provided in § 7174.3. This same page of § 7174.3 states: "In any case, a suspension must be based on specific reasons fully substantiated by fact." Palpably, the suspension of Dr. Simmons was not, and could not have been, "based on specific reasons fully substantiated by fact." Thus, even under the Department of Public Welfare's own Personnel Manual, the July 29, 1991 "suspension" was a nullity as a matter of Pennsylvania administrative law.

---

**6.** Putting aside the short deadline for completion of the form, Mr. Didario also had to know that all of Dr. Simmons's papers, including his prior years' disclosure forms, were securely in the hands of the hospital after the purging of Dr. Simmons's working office in May. Mr. Didario thus knew that by this request he was asking the impossible of Dr. Simmons.

█ The whole chain of events that commenced with the charade of the July 29 "suspension" letter was a clever pretext to establish the "cause" the Veteran's Reemployment Rights Act offers employers as a way out of the requirement to give restoration or reemployment for at least one year to returning veterans. See 38 U.S.C. § 2021(b)(1)(A). It is clear under the law that the employer bears the burden of establishing the "cause" mentioned in the statute. *See, e.g., Carter v. United States,* 407 F.2d 1238, 1242 (D.C.Cir.1968). As we held in open court on April 10, the Commonwealth of Pennsylvania has not begun to carry the burden that the statute, as construed, imposes.

To the contrary, the record established that the "investigation" of the pharmacy was nothing more than a pretext Dr. Kunst and Mr. DiDario used in order to prevent Dr. Simmons from resuming the duties he had performed with such distinction before he left to serve his country. It was to avoid precisely this sort of shabby behavior that Congress adopted the Veteran's Reemployment Rights Act, and Dr. Simmons therefore occupies the position Congress sought to protect under the statute. As the Supreme Court of the United States has recently instructed in *King v. St. Vincent's Hospital,* — U.S. —, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991), moreover, the "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." — U.S. at —, 112 S.Ct. at 574, citing *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946).

Under 38 U.S.C. § 2022, district courts "shall have the power ... specifically to require ... employer[s] to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action." By its terms, the statute specifically covers "any employer, who is a private employer or a State or political subdivision thereof", *id.* The Act has a special section dealing with "Rights of persons who enlist or are called to active duty; Reserves", namely § 2024. It cannot be disputed that Dr. Simmons is within the coverage of the statute and has established his entitlement to remedies under the Act.

The remedies available to Dr. Simmons are, in the Court's opinion, modest in view of the bad faith treatment he suffered in this Kafkaesque drama. Our final judgment and decree, however, gives him no more than what Congress provided in 38 U.S.C. § 2022.

## FINAL JUDGMENT AND DECREE

AND NOW, this 14th day of April, 1992, after a non-jury trial, and for the reasons stated in open court, pursuant to Fed. R.Civ.P. 52(a), as supplemented in the foregoing Memorandum, it is hereby ORDERED AND DECREED THAT:

1. Judgment shall be entered in favor of plaintiff and against defendants;

2. Defendants Commonwealth of Pennsylvania and Karen F. Snider, Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, shall forthwith pay to John W. Simmons, M.D., all wages to which he was entitled, commencing at 9:00 a.m. on July 29, 1991 through the date of this Decree;

3. Defendants Commonwealth of Pennsylvania and Karen F. Snider, as Secretary of the Department of Public Welfare of the Commonwealth of Pennsylvania, shall pay to Dr. Simmons, in lieu of the benefits he lost by reason of the defendants' unlawful actions, the cash equivalent to the value of such benefits, including, without limitation, the "monthly stipend of $400.00 per month" that was paid "to Commonwealth employees who are military reservists" who served "during the Middle East crisis" (such stipend shall be paid for the period November 30, 1990 through July 26, 1991);

4. Defendants shall restore or reemploy Dr. Simmons, without loss of seniority, as Acting Medical Director of Norristown State Hospital for a period of no less than one year from this date;

5. Costs taxed against defendants.