**William H. CAVANAGH, Plaintiff**

v.

**PINKERTON'S NATIONAL DETECTIVE AGENCY, INC.,**
Defendant.

**Civ. A. No. 60-101-W.**

United States District Court
D. Massachusetts.

Sept. 15, 1961.

Weyman I. Lundquist, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Charles F. Choate, Philip Dexter, Choate, Hall & Stewart, Boston, Mass., for defendant.

WYZANSKI, District Judge.

Relying upon § 9(d) of the Universal Military Training and Service Act of 1951, as amended, 50 U.S.C.A.Appendix, § 459(d), plaintiff, a former serviceman, brings this suit claiming compensation and "such other and further relief as the Court may deem just and proper."

Pinkerton's National Detective Agency, Inc., a Delaware corporation, having a place of business in Boston, is a widely known agency for supplying guards, investigators, and various types of protective service. In its Boston office it em-

ploys a manager, assistant managers, a chief clerk, a supervisor of guards, so-called "salesmen" to solicit customers, so-called "management trainees", investigators, guards, and others.

When in 1953 Leonard was one of Pinkerton's assistant managers he induced his friend, plaintiff Cavanagh, to enter defendant's employ as a management trainee. That occupation requires the incumbent to serve under various specialized supervisors who teach the trainee salesmanship, guard duty, and other functions which relate to the work supervised by the particular superior giving the training. After training, a management trainee ordinarily becomes one of defendant's investigators. Neither a management trainee nor an investigator is engaged in tasks which require a high degree of formal education, or qualities of rare ability, or such exceptional trustworthiness and personal confidence as are prerequisite for service in the highest echelons of military, diplomatic, professional, or comparable callings. As shown by the salary scale applicable to them, and by the tasks assigned to them, such as guarding buildings, checking entrants to fairs, and inquiring about the political proclivities of prospective employees, the usual management trainee or investigator is in hardly so confidential or delicate a position as the ordinary foreman. The most that can be said is that such an employee is required to have traits of honesty, truthfulness, good general character, good health, capacity to get along with people, and the ability both to follow through instructions and to instruct others similarly to carry out instructions.

December 8, 1955 plaintiff left defendant's employment to enter the Armed Forces of the United States. He served continuously in active service from that date to September 3, 1957. Two days later he applied for, and received, employment by defendant.

There are some indications that defendant regarded plaintiff's service as satisfactory. Defendant gave him small raises of 5 cents an hour on several occasions, but these may have been responsive more to general policy of periodic increases, rather than to a severely personal appraisal. However, Leonard, as Pinkerton's manager of its Boston office, made on occasion what seems more than a routine favorable report when he suggested plaintiff as a possible candidate for assistant manager.

On the other hand plaintiff's record was badly spotted. In November 1957, he put in, as he himself contemporaneously admitted, a padded report of time spent, and he committed a similar wrong in March 1958. On both occasions his superior reprimanded him, caused the excess claims to be reduced before payment, and, at least impliedly, warned against the consequences of further similar attempted misappropriations. However, when the Wage and Hour Division of the U. S. Department of Labor investigated defendant, its representatives, apparently not persuaded of the employer's right to deduct from plaintiff's original claims, required the employer to pay plaintiff at least some, and perhaps all, of the amounts originally claimed.

Defendant's assistant manager, Buttrick, noting that the plaintiff claimed as an expense $5 paid as an informer's fee, was unable to learn from plaintiff to what person, if any, the fee was paid, although under company rules plaintiff was obligated to disclose the name of the recipient.

Plaintiff's supervisor, Reilly, complained that when the plaintiff was assigned to accompany him on a "salesmanship" mission, plaintiff, without any basis told the prospective client that all Pinkerton men were equipped with machine guns and leg irons.

Chief clerk Walsh objected that, without authority, plaintiff took keys from Walsh's office, used them to open a reserved closet, wrongfully deposited therein company property not properly belonging there, and engaged in hard words and uncomfortable jostling when directed to remove that property to another place.

Assistant manager, Bass, having assigned plaintiff to stand at the pedestrian

gate at the Rochester, New Hampshire fair to check tickets, found him "chewing the fat" at the gate for automobile entrants. Bass also had occasion to reprimand plaintiff for unauthorized removal of tickets and general insubordination. And Bass was awakened by unseemly conduct of plaintiff at night in the quarters where he and other employees of defendant were billeted.

These incidents led the assistant managers and supervisors to tell Leonard at least as early as the beginning of May that they did not want plaintiff under their direction. For this reason, and quite unaffected by any improper reason, Leonard, who by then had become manager of defendant's Boston office, orally discharged plaintiff on May 10, 1958.

Neither Leonard nor any other official of Pinkerton was affected in the slightest by plaintiff's interest, if any he then had, in unionism. No Pinkerton representative knew of plaintiff's possible affirmative interest in labor organization; and indeed it was not until the following fall that plaintiff publicly exhibited his interest by joining a union.

Nor was Leonard at the time he gave the discharge notice specifically acting on account of plaintiff's indolence in the Weymouth investigation to which he had been assigned, as a subordinate of Gillis, in May. But Leonard did know that Gillis was generally dissatisfied with plaintiff, although at the time of discharge, plaintiff's report of work he had claimed to have put in on the Weymouth assignment had not been studied by Gillis or Leonard.

After he had discharged plaintiff, Leonard did not give to either plaintiff, or to the representatives of the Bureau of Veterans' Reemployment Rights or to plaintiff's counsel inquiring in pre-trial discovery procedures, as full an account of the conduct of plaintiff as Leonard gave this Court. But, on the other hand, nothing that Leonard said before trial is inconsistent with the full recital Leonard gave on the witness-stand in the plenary trial when he recited most of what is set forth in these findings. Nor is the fact that on April 1, 1958 Leonard still wished plaintiff to stay an indication of more than a personal hope that his friend would somehow work out as a satisfactory employee. Moreover, it is this Court's finding that at all times Leonard viewed his discharge of plaintiff as motivated solely by the unsatisfactory conduct of plaintiff and his proven incapacity to act agreeably to the reasonable usages of Pinkerton's and to the decent respect owed by a subordinate to his superiors and associates.

Having observed plaintiff himself in the courtroom, this Court has an abiding impression of his lack of forthrightness, his generally intractable personality, and his manifest unfitness for continued association with the particular team of defendant's workers at the Boston office. While the level of defendant's employees and superiors may not reach enviable heights, plaintiff was objectionable to them as an associate, and would so appear to a normal reasonable employer applying objective, relevant, and disinterested standards.

The fact that Leonard's predecessor as manager, McKenna, did not observe in the period when he was manager any misconduct of plaintiff or any difficulty between plaintiff and his supervisors, does not persuade me that there were not difficulties caused by the plaintiff which were not known to McKenna. For, admittedly, plaintiff never worked directly under McKenna, and McKenna in January 1958 ceased to be Boston manager of Pinkerton's.

The question of law is whether on May 10, 1958 plaintiff was "discharged * * * without cause" in violation of 50 U.S. C.A.Appendix, § 459(c) (1).

█ The statutory provision, carried over from § 8 of the Selective Training and Service Act of 1940, as amended, 54 Stat. 890, 56 Stat. 724, 58 Stat. 798, 50 U.S.C.A.Appendix, § 308, is to be "liberally construed" for the benefit of those who have rendered active service. Cf. Fishgold v. Sullivan Drydock & Repair

Corp., 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230; Trusteed Funds v. Dacey, 1 Cir., 160 F.2d 413, 418. Yet, as Minton C. J. ruled, when he sat as a circuit judge, an employer may discharge a service veteran if the employer's "action was such as a fair-minded person might act upon * * *. The cause intended by the statute does not have to be a legal cause. It may be such cause as a fair-minded person may act upon, and where such action is not arbitrarily taken with a purpose or as an excuse to avoid the statute, it is cause within the meaning thereof." Keserich v. Carnegie-Illinois Steel Corp., 7 Cir., 163 F.2d 889, 890. To the same effect see Biggs C. J. in Kemp v. John Chatillon & Sons, 3 Cir., 169 F.2d 203, 206–207.

■ In the instant case Pinkerton's did not act precipitately nor arbitrarily in discharging plaintiff. Nor is there the slightest showing that toward plaintiff anyone had malice or spite, or that the employer or any of his representatives had hostility toward the statute conferring privileges on veterans, or that the employer or his representatives had any reason for supposing plaintiff was a potential "union agitator", or that the defendant was affected by any other unworthy motive. On the contrary, Pinkerton's patiently kept plaintiff for half a year after he had returned from active military duty. His manager, in a spirit of personal good-will, encouraged him to stay in April. What seems finally to have exhausted manager Leonard's patience were a series of irritations, petty in themselves, but cumulatively more straw than the reasonable backs of the assistant managers could bear. Petty annoyances are not to be tested by an artificial piece by piece analysis. The bundle is to be weighed as a totality, just as in the case of the classic example of the faggots. And, if as a whole, an employee is unreliable, lazy, or a fomenter of discord, Congress did not intend to give him a year's sinecure at private expense following public service in the armed forces.

Complaint dismissed.